Opinion filed May 24, 2007


















 
 
  
 
 







 
 
  
 
 




Opinion filed May 24, 2007

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                 ____________

 

                                                          No. 11-05-00254-CR 

                                                    __________

 

                              COREY SHAROD FREEMAN, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS,
Appellee

 



 

                                         On
Appeal from the 194th District Court

 

                                                          Dallas County, Texas

 

                                            Trial
Court Cause No. F02-71513-RM

 



 

                                                                   O
P I N I O N

 

The jury convicted Corey Sharod Freeman of murder
and assessed his punishment at fifteen 
years confinement and a $5,000 fine. 
We affirm.

                                                             I.  Background Facts








In the early morning hours of February 16, 2002,
Steve Fields (Red) was fatally shot three times at the Aspen Chase apartment
complex.  During the ensuing
investigation, the police received a call from Red=s
common-law wife.  She gave them Priscilla
Brewer=s name
and phone number.  Detective Randy Edward
Loboda contacted Brewer and arranged a meeting. 
He showed her six pictures, including a picture of Freeman.  Brewer was unable to identify the shooter,
but she did provide a written statement implicating Freeman.  She indicated that Freeman shot Red in
retribution for stealing crack cocaine from his apartment.

Detective Lauran Elterman subsequently interviewed
Schawana Johnson.  She too provided a
written statement implicating Freeman. 
Johnson and Freeman were living together.  She stated that someone broke into their
apartment and stole Freeman=s
crack cocaine.  Freeman believed Red was
responsible and threatened to beat him. 
The night of the shooting, Freeman came into their apartment, woke her,
and took her to a park.  There, he told
her that he had gotten into an altercation with Red and started shooting.

Detective Elterman also obtained a statement from
Bridget Daniels.  Daniels saw Freeman
driving through the complex two days before the shooting.  He stopped and asked her if she had seen
Red.  Freeman told her that Red had
kicked in his door and stolen $80 worth of drugs and that he intended to A[k]ick his ass.@  After the shooting, Freeman called her and
asked what was being said in the complex about the shooting.  She told him that people believed he had
killed Red.  He responded that A[i]t wasn=t
supposed to go down like that.@  Freeman was arrested and was indicted for
murder.

                                                                       II.  Issues

Freeman challenges his conviction with nineteen
issues.  These can be grouped into seven
areas:

$          the
composition of the venire panel;

$          rulings
made by the trial court in response to Brewer=s
testimony;

$          other
evidentiary rulings made during trial;

$          the trial court=s
admonitions to Freeman when his trial counsel indicated an intention to not put
on a defense following an adverse ruling;

 

$          the trial court=s
failure to sua sponte grant a mistrial in response to actions taken by the
State;

 

$          requests for lesser included offenses
in the charge; and

 

$          factual sufficiency challenges.

 








                                                                     III.
Analysis

A.  The
Composition of the Jury Panel.

Freeman objected to the jury panel because only
seven of seventy-two potential jurors were African-American.  Freeman contended that African-Americans
constituted approximately 45% to 48% of Dallas County=s population and, therefore, that it
would be impossible to pick a constitu-tionally sufficient jury from this
panel.[1]  The trial court denied Freeman=s motion to quash the panel noting that
it had been randomly selected and that the clerk of the Central Jury Room did
not know the defendant=s
race when a jury was ordered.

The Constitution does not require proportionate
representation of races on jury panels, but it does require that panels be
selected without discrimination as to race. 
May v. State, 738 S.W.2d 261, 269 (Tex. Crim. App. 1987).  A constitutional violation exists when the
under-representation of a distinctive group in the community results from
systematic exclusion of that group in the jury selection process.  Duren
v. Missouri, 439 U.S. 357, 364
(1979).  This requires proof of more than
disproportionate representation in a single panel.  May, 738 S.W.2d at 269.

Freeman argues that the under-representation of
African-Americans necessarily resulted from systematic exclusion because the
record contains no evidence of a random selection process.  The record contains few details concerning Dallas County=s jury selection process, but because
Freeman had the burden of proof, this silence weighs against rather than for
his position.  Because Freeman offered no
evidence beyond his attorney=s
description of Dallas
 County demographics, the
trial court did not err when it denied his motion to quash.  Freeman=s
fifteenth issue is overruled.

B.  The
Trial Court=s Rulings
in Response to Priscilla Brewer=s
Testimony.








Freeman=s
counsel advised the trial court prior to the start of testimony that he
believed the State would attempt to offer inadmissible hearsay evidence.  The State responded that it intended to offer
evidence through Brewer that fell within the present-sense-impression
exception.  The trial court then conducted
a hearing to determine the admissibility of Brewer=s
expected testimony.  Brewer testified
that, in February 2002, she lived in the Aspen Chase Apartments and that, on
the morning of February 16, 2002, she witnessed a shooting.  Brewer and an individual named Miquel were
riding in her car.  They heard gunfire
and looked up.  Miquel said, AThat=s
Corey.@  Brewer asked, A[I]s
it?@ 
Miquel responded, A[Y]es.@

Freeman lodged several objections to this
testimony and asked for a continuance to try to locate Miquel.  The trial court overruled Freeman=s objections and allowed Brewer to
testify about Miquel=s
statements.  Freeman asserts four issues
related to the admission of this testimony.

1. 
Did the Court Err by not Granting a Continuance?

Freeman asserts first that the trial court erred
by not granting his oral motion for continuance.  Freeman=s
issue has not been preserved because he did not file a written, sworn motion
for continuance.  See Tex. Code Crim. Proc. Ann. arts. 29.03,
29.08 (Vernon 2006); see also Dewberry v. State, 4 S.W.3d 735, 755 (Tex.
Crim. App. 1999).  Freeman=s first issue is overruled.[2]  

            2.  Did the Trial Court Err by not Granting
Freeman=s Motion
for Mistrial?

When the State rested, Freeman asked for a
mistrial contending that the State concealed Brady material by not
revealing that Brewer was recanting her statement.[3]  The State responded that Brewer did not
recant but provided additional detail. 
The trial court was already aware that Freeman=s
counsel had spoken to Brewer before trial[4]
and had previously noted that the State tendered more discovery material before
trial than was required or requested.[5]  Following counsel=s
argument, the trial court reconfirmed that Freeman=s
counsel had interviewed Brewer and then held that her testimony did not
constitute Brady material.

The denial of a motion for mistrial is reviewed
for an abuse of discretion.  Ladd v.
State, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999).  We analyze the alleged Brady violation
in light of all the other evidence adduced at trial.  Hampton
v. State, 86 S.W.3d 603, 612-13 (Tex.
Crim. App. 2002).








The State has an affirmative duty to disclose
exculpatory evidence that is material either to guilt or punishment.  Brady, 373 U.S. at 86.  The State=s
duty to reveal Brady material attaches when the information comes into
its possession, not when it is requested.[6]   Thomas v. State, 841 S.W.2d 399, 407
(Tex. Crim. App. 1992).  To establish
reversible error, a defendant must show that (1) the State failed to disclose
evidence, regardless of the prosecution=s
good or bad faith; (2) the withheld evidence is favorable to him; and (3) the
evidence is material, i.e., there is a reasonable probability that, had the
evidence been disclosed, the outcome of the trial would have been different. Hampton, 86 S.W.3d
at 612.

The State called Brewer as its first witness.  Brewer testified that she was taking Miquel,
a family friend, home.  As she got into
her car, she saw Red walk past.  She and
Miquel heard gunshots and looked up.  She
saw sparks coming from a gun and heard Miquel say, AThat=s Corey.@
She saw the shooter bend down as if he had dropped something, stand up, and
start shooting again. The shooter then walked to the back of the apartment
complex where Freeman and Johnson lived. Brewer checked on Red, went to her
apartment to call the police, and came back to Red.  When she did, she saw Freeman and Johnson
speed away from the complex.  Brewer
later spoke with the police and told them that she saw Freeman shoot Red.

The State provided Freeman=s
counsel with a copy of Brewer=s
statement after her direct examination. 
Brewer=s
statement included the following:

I
was in my car fixin [sic] to leave and I saw Red walk past my car.  Red turned the corner and then I heard
shots.  I looked up and saw Corey
shooting at Red.  Corey fired a couple of
shots, stopped, then fired two more shots. 
Red was running and ducking.  I
saw the flash coming from Corey=s
gun.  I turned around the corner and that=s when I saw Red laying on the
ground.  Corey got into his car, a gray
or silver Mustang and took off out of the apartments.  I haven=t
seen him since that night.

 








In support of his motion for mistrial, Freeman pointed out that
Brewer=s
statement made no reference to Miquel and contended that the investigating
officer probably caused his name to be omitted. Freeman argued that the trial
disclosure of Miquel=s
name had Aobliterated@ his planning, defensive  theory, and strategy and, therefore, that he
had been blind-sided because he now realized that the State=s identification was based upon an
unknown person that he could not subject to cross-examination.  Freeman advised the trial court that, had he
known about Miquel, he would have tried to find and interview him, and might
have possibly called him as a witness.

Unquestionably, it would have benefitted Freeman
to know prior to trial that Brewer would testify that she was with Miquel; that
she heard him say A[t]hat=s Corey@;
and that her identification of Freeman was based, at least in part, on Miquel=s comment.  We do not doubt that this lack of information
caused Freeman=s counsel
to misjudge the State=s
trial strategy.  The State=s failure to provide Freeman with
information that put him at a tactical disadvantage, however, does not
automatically constitute a Brady violation.  

The Brady rule recognizes that the State is
in the unique position of being an advocate while striving to obtain a just
result.  United
 States v. Bagley, 473 U.S. 667, 675
(1985).  It is not a general discovery
rule and does not require the State to share all useful information with the
defendant.  Weatherford v. Bursey,
429 U.S.
545, 559 (1977).  Nor does it displace
the adversary system.  Bagley, 473
U.S.
at 675.  The State is not required to
seek out exculpatory evidence independently on the defendant=s behalf or to furnish him with
exculpatory or mitigating evidence that is fully accessible from other
sources.  Harm v. State, 183
S.W.3d 403, 407 (Tex.
Crim. App. 2006). 

The record does not establish that the trial court
abused its discretion.   Freeman=s contention is more of a discovery
concern than a Brady complaint. 
Brewer did not recant her written statement, and the fact that someone
else would presumably identify Freeman as the shooter was not exculpatory.  Brewer believed that Freeman was the shooter
when she met with the police, and she testified at trial that Freeman was the
shooter.   Her trial testimony that she
saw the gun flashes, saw the shooter bend down and then stand back up and fire
additional shots, and later saw Freeman leave the complex in his car is
consistent with her written statement. 
Her trial testimony about Miquel explains why she believed Freeman was
the shooter.  This additional information
was equally available to both attorneys. 
Freeman=s second
issue is overruled.

3. 
Did the Trial Court Err by Denying Freeman=s
Confrontation Clause Objection?








Freeman argues that the admission of Miquel=s comments via Brewer=s testimony violated  his constitutional right to confront the
declarant.  See Crawford v. Washington,
541 U.S.
36, 42 (2004) (the Sixth Amendment guarantees the accused the right to confront
the witnesses against him).  The
confrontation clause applies only to testimonial evidence.  Spencer v. State, 162 S.W.3d 877, 879
(Tex. App.CHouston
[14th Dist.] 2005, pet. ref=d).  Spontaneous statements to acquaintances are
not testimonial.  Woods v. State,
152 S.W.3d 105, 114 (Tex. Crim. App. 2004); 
see also Crawford, 541 U.S. at 51 (A[a]n
accuser who makes a formal statement to government officers bears testimony in
a sense that a person who makes a casual remark to an acquaintance does not@). Brewer testified that Miquel was a
family friend.  He had been at her
apartment with her family, and she was taking him home when the shooting
occurred.  The comments he made to her
were in immediate response to the shooting both had just observed.  These comments were not testimonial, and the
trial court did not err when it denied Freeman=s
objection.  Freeman=s third issue is overruled.

4. 
Did the Trial Court Err by Denying Freeman=s
Hearsay Objection?

Freeman also argues that Miquel=s comments were inadmissible
hearsay.  The State does not dispute that
they are hearsay but contends that they fall within the present-sense-impression
exception.  Tex. R. Evid. 803(1). 
The trial court=s
decision to admit evidence is reviewed under an abuse of discretion
standard.  Burden v. State, 55
S.W.3d 608, 615 (Tex.
Crim. App. 2001).  An appellate court may
not reverse that decision unless it falls outside the zone of reasonable
disagreement.  Id.

The present-sense-impression exception requires
that the statement be made simultaneously with the event or immediately
thereafter and that it describe or explain an event or condition.  Steven
Goode et al, Courtroom Handbook on Texas Evidence 507 (2005).  The exception=s
rationale is that the declarant=s
statement is free from the defects of memory, that there is little or no time
for calculated misstatement, and that the statement is usually made to someone
with equal opportunity to observe and thus check a misstatement.  Rabbani v. State, 847 S.W.2d 555, 560
(Tex. Crim. App. 1992).








In Rabbani, present-sense-impression
evidence was used to establish identity in a murder trial.  A witness was allowed to testify that, the
day before the murder, the victim was standing in front of a window and said
that he saw the defendant outside.  Id. at 559.  The testimony was relevant because it
indicated that the defendant was in the vicinity of the victim=s home prior to his murder.  Because the statement described something the
victim was observing and was made at the same time as he observed it, the court
concluded that it was a present sense impression.  Id.
at 560.  The same situation exists
here.  Miquel=s
statement A[t]hat=s Corey@
was made as he watched the shooting, and it described what he had just
seen.  It constitutes a present sense
impression; thus, the court did not err by allowing this testimony.  Freeman=s
fourth issue is overruled.

C.  Other
Evidentiary Rulings.

1. 
Did the Trial Court Err by Compelling Johnson to Testify?

Freeman and Johnson were ceremonially married on
February 22, 2002.  Freeman contends that
he and Johnson were previously common-law married.  Therefore, he argues that the spousal
privilege applied and that Johnson could not be compelled to testify against
him.  See Tex. R. Evid. 504(a). 
The trial court conducted a pretrial evidentiary hearing pursuant to Tex. R. Evid. 104(a) to determine
whether the spousal privilege applied. 
Following that hearing, the trial court ruled that a common-law marriage
did not exist and that Johnson would be required to testify.  We review this decision for an abuse of
discretion.  McDuffie v. State,
854 S.W.2d 195, 212-13 (Tex. App.CBeaumont
1993, pet. ref=d).  While performing this review, we consider the
evidence in the light most favorable to the trial court=s
ruling.  Jasper v. State, 61
S.W.3d 413, 419 (Tex.
Crim. App. 2001).

Freeman had the burden of proof to establish that
a common-law marriage existed. Welch v. State, 908 S.W.2d 258, 264-65
(Tex. App.CEl Paso
1995, no pet.).  This required proof that
(1) Freeman and Johnson agreed to be married, (2) they lived together after the
agreement in Texas
as husband and wife, and (3) they represented to others that they were husband
and wife.  Colburn v. State, 966
S.W.2d 511, 514 (Tex. Crim. App. 1998). 
The State does not dispute that Freeman and Johnson were living together
when Red was killed but focuses its attention on Johnson=s
actions shortly before and after the shooting to argue that the trial court had
sufficient evidence to conclude that no informal marital relationship
exited.   








Freeman testified himself, and he called several
friends and family members as witnesses. 
Their testimony established that Freeman and Johnson moved into the
apartment complex together sometime in 2001. 
Several witnesses testified that they understood Freeman and Johnson
were married, that Freeman and Johnson conducted themselves as a couple, and
that Johnson treated Freeman=s
son as her own.  Freeman testified that,
when they moved in together in 2001, they agreed to become husband and
wife.  Three days after the shooting, Freeman
and Johnson applied for a marriage license and were formally married shortly
thereafter.

Other evidence was inconsistent with an informal
marriage agreement.  Detective Elterman
testified that he met with Johnson two days after the shooting.  Johnson referred to Freeman as her boyfriend,
and she indicated that they were living together.  Johnson provided the police with a written
statement and personal information sheet. 
She listed her mother as her emergency contact person on the information
sheet, and in her affidavit, she referred to Freeman by name rather than as her
husband.  Johnson executed an apartment
lease in August 2001 when she and Freeman moved into the apartment complex
together.  On the space for spouse,
Johnson indicated Anot
applicable.@

The trial court was, thus, presented with
conflicting evidence concerning whether, at the time of the shooting, Freeman
and Johnson had agreed to be married and were representing to others that they
were married.  Viewing this evidence in
the light most favorable to the trial court=s
ruling, we cannot conclude that the trial court abused its discretion when it
held that Freeman did not carry his burden of proof.  Freeman=s
sixth issue is overruled.

2. 
Was Johnson=s
Written Statement Inadmissible Hearsay?

The State called Johnson as a witness and
attempted to ask her about a written statement that she provided to Detective
Elterman.  When Johnson did not respond,
the trial court ordered her to answer the State=s
questions and threatened to hold her in contempt.  Johnson testified that she recalled providing
a written statement, and she identified the signature on State=s Exhibit 3 as her own.  Johnson then testified that she did not
recall providing the statement to Detective Elterman, and she refused to answer
any further questions about it.  The
trial court ordered Johnson removed from the courtroom, and the State called
Detective Elterman.  He testified that
Johnson provided the police with a statement on February 18, 2002, and he
identified State=s Exhibit
3 as that statement. The trial court allowed the State to introduce State=s Exhibit 3 into evidence to impeach
Johnson=s
testimony that she did not recall providing it to Detective Elterman.








Freeman contends the trial court abused its discretion
because the statement itself is hearsay and because it contains hearsay
statements allegedly made by him to Johnson. 
Freeman=s double
hearsay objection has not been preserved for our review.  Freeman initially objected to Johnson=s statement because it was hearsay and
had been disavowed by Johnson.  Freeman
then objected because the statement=s
admission denied him his right of confrontation and cross-examination. Neither
objection preserves a double hearsay issue. 
See Ricketts v. State, 89 S.W.3d 312, 319 n.1 (Tex. App.CFort Worth 2002, pet. ref=d) (hearsay objection does not preserve
a double hearsay issue).

The trial court did not abuse its discretion by
admitting Johnson=s
statement for impeachment purposes because her testimony was equivocal.  See McGary v. State, 750 S.W.2d 782,
786 & n.3 (Tex.
Crim. App. 1988) (unless a witness unequivocally admits making a prior
inconsistent statement, it may be used for impeachment). Moreover, the record
shows no harm.  Johnson subsequently
reconsidered her refusal to testify, and she testified about the matters
covered in her statement.  Freeman=s seventh issue is overruled.

3.  Did the Trial Court
Err by Denying Freeman=s
Motion for Mistrial after 

Evidence that Crack Cocaine had been Stolen from Freeman=s Apartment was Admitted?

 

Brewer testified that someone broke into Freeman
and Johnson=s
apartment and stole crack cocaine. 
Freeman objected, contending that this was inadmissible hearsay.  The trial court sustained Freeman=s objection and instructed the jury to
disregard Brewer=s
statement.  Freeman then moved for a
mistrial.  The trial court overruled his
motion.  Freeman argues that this was an
abuse of the trial court=s
discretion.

The general rule is that a prompt instruction to
disregard will cure the prejudicial effect associated with an improper question
and answer concerning an extraneous offense. 
Ovalle v State, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000).  To justify a mistrial, the testimony must be
so prejudicial that expenditure of further time and expense would be wasteful
and futile.  Ladd, 3 S.W.3d at
567.








Freeman contends that such a situation is present
because Brewer=s
statement allowed the State during closing argument to paint him as a drug dealer
and a bad person in general.  Freeman=s position ignores both what occurred
immediately after his objection and what subsequently occurred during
trial.  First, when the trial court
sustained Freeman=s
objection, the State did not ask Brewer any further questions about the
break-in.  Second, during Freeman=s own testimony, he testified about
drugs and drug usage in his apartment. 
Freeman testified that, when he moved in with Johnson, he knew that she
had a cocaine habit.  He denied using or
selling drugs himself, pointed to the fact that he never failed a drug test at
work, and contended that his lifestyle was inconsistent with drug dealing.  He testified that, if any drugs were taken
from his apartment, they would have belonged to Johnson.  In fact, Freeman contended that Johnson had
been heavily using drugs the day before the shooting.

Freeman has failed to establish the level of
prejudice necessary to constitute an abuse of discretion.  The jury was properly and timely instructed
to disregard Brewer=s single
remark concerning crack cocaine.  The
State=s closing
argument was not directly tied to that single remark but reflects significant
other evidence B much of
it coming from Freeman=s
own testimony on direct.  We cannot say
that the trial court abused its discretion when it denied Freeman=s motion for mistrial, and his eighth
issue is overruled.

4.  Did the Trial Court
Err by Allowing Daniels to Testify that She Purchased 

Drugs from Freeman?

 

The State called Daniels as a rebuttal
witness.  During her cross-examination,
Freeman=s counsel
asked if Johnson was a known drug addict, and counsel confirmed that, when
Freeman threatened to retaliate against Red for breaking into his apartment and
stealing drugs, Freeman did not say the stolen drugs were his.  The State argued that these questions opened
the door to further testimony. The trial court conducted a hearing outside the
jury=s
presence and ruled that the State could ask Daniels if she had ever personally
purchased drugs from Freeman.  Freeman
argues that the trial court abused its discretion because his cross-examination
did not open the door to this testimony or, alternatively, that the probative
value of this evidence was outweighed by its unfair prejudice.

The only motive ever developed for the shooting
was the theft of crack cocaine from Freeman and Johnson=s
apartment.  When Freeman cross-examined
Daniels, the jury had already heard her testify that Freeman was looking for
Red because of the theft of his drugs, and the jury had heard and seen Johnson=s statement in which she told the
police that Freeman had threatened to hurt Red in retaliation for stealing his
cocaine.  Freeman understandably wanted
to undermine this motive by establishing that the stolen cocaine actually
belonged to Johnson.  Daniel=s testimony that she had purchased
drugs from Freeman out of his apartment was relevant because it rebutted the
suggestion that Freeman had no interest in any crack cocaine that might have
been stolen from his apartment.








Even though relevant, Daniel=s testimony may still be excluded if
its probative value is substantially outweighed by the danger of unfair
prejudice.  See Tex. R. Evid. 403.  When evaluating a trial court=s determination under Rule 403, a
reviewing court is to reverse the trial court=s
judgment Ararely
and only after a clear abuse of discretion@
because the trial court is in a superior position to gauge the impact of the
relevant evidence.  Mozon v. State,
991 S.W.2d 841, 847 (Tex. Crim. App. 1999). 
In conducting a Rule 403 analysis, the court is to consider (1) the
probative value of the evidence, (2) the potential to impress the jury in some
irrational yet indelible way, (3) the time needed to develop the evidence, and
(4) the proponent=s need
for the evidence.  Prible v. State,
175 S.W.3d 724, 733 (Tex.
Crim. App. 2005).

Daniel=s
testimony had probative value because it went to Freeman=s
motive and it put her personal knowledge in context.  The challenged testimony consisted of only
two questions.  The State needed to
establish a motive.  Allowing these two
questions not only addressed that need but also kept the testimony in context
because they were asked in immediate response to Freeman=s
cross-examination.  Finally, the evidence
was not likely to impress the jury in some irrational but indelible way.  Daniel=s
rebuttal testimony was not the first time that the jury had heard that the
crack cocaine belonged to Johnson rather than Freeman.  When Johnson reconsidered her refusal to
testify, she testified in response to Freeman=s
cross-examination that the cocaine belonged to her and not Freeman,
acknowledged her drug addiction, and agreed that Freeman was required to take
random drug tests at work.  Daniel=s testimony provided a logical
explanation for why, nonetheless, the crack cocaine could still belong to
Freeman.  Issue nine is overruled.

5. 
Did the Trial Court Err by not Allowing Evidence of Red=s Prior Car Burglaries?

Freeman argues that the trial court abused its
discretion by not allowing evidence of Red=s
prior convictions for  burglarizing cars
or evidence that he was known as a car burglar. 
Freeman=s
principal argument is that this evidence was admissible to show that he acted
reasonably to defend his property. 
Freeman testified on his own behalf. 
He told the jury that on the day of the shooting his car alarm woke him
and that he went outside and saw that Red had his car door open.  Freeman yelled, Red took off running, and
Freeman shot at him to make him stop.  On
cross-examination, Freeman clarified that at the time of the shooting he did
not know who was breaking into his car and did not learn that he had shot Red
until two weeks to a month later.








Because Freeman testified that he did not know who
was breaking into his car, Red=s
prior criminal history and general reputation would have had no bearing on the
reasonableness of Freeman=s
actions.  The trial court did not abuse
its discretion by not admitting this evidence.[7]  Issues ten and eleven are overruled.

D.  Did the Trial Court
Err When It Admonished Freeman after his Trial Counsel Indicated an Intention
to Put on No Defense?

 

During the pretrial hearing on the admissibility
of Brewer=s
testimony, Freeman=s trial
counsel stated that allowing Brewer to testify about Miquel=s comments was so unfair:

[T]hat
my proclivity would be to just make this argument to the Court and just sit
here and let the State put on the rest of their case without any
cross-examining, without any defense, and we=ll
just go to the Courts of Appeal and see what they say about it.  Now, that=s
something I certainly don=t
want to do, but I have done it in the past and I would be loath to do it, but I
will do it.

 

The trial court ruled that Brewer=s
testimony would be admitted, and trial counsel then began what the trial court
would later accurately describe as juvenile behavior.[8]

During his opening statement, Freeman=s trial counsel told the jury:  AAnd
if you folks see me sitting here and not participating in this trial because I
don=t think that B@ 
The State objected, the trial court sustained the objection, and counsel
announced that he had no further opening. 
During Brewer=s
direct testimony, when the State proffered exhibits and the trial court asked
counsel if he had any objection, he made comments such as:

We
have no comments, no objections, nor anything else other than our motion for
continuance to try to find the missing witness who we learned about this
morning.

 

I
have no comments, no objections, no anything.

 

I=m not prepared at this time, Your
Honor, to consider that.  I renew my
motion for continuance.

 








Your
Honor, excuse me, but my position is I am not in a position to make objections
to these exhibits.  So if the Court finds
them to be admissible, the Court may admit them.

 

The
Court can construe the record any way it wants to, Your Honor.

 

After this last comment, the trial court excused the jury,
confirmed that trial counsel was retained, and advised Freeman:

[THE COURT]: 
Mr. Freeman, certain rulings have been made which your attorney of
record disagrees with.  That is the whole
purpose of appellate records, Mr. Freeman. 
However, your attorney has stated in open court on the record that he
basically intends not to offer a defense for you, not to basically represent
you, and to just sit there and let the State continue with their case.  You understand that?

 

[FREEMAN]: Yes, ma=am.

 

THE COURT: You were present when he made those
statements in court; is that correct?

 

[FREEMAN]: Yes, ma=am.

 

THE COURT: We have had one witness so far.  You were present when he made the statements
regarding certain evidence being admitted. 
Do you recall that?

 

[FREEMAN]:
Yes, ma=am.

 

THE COURT: You have a choice, Mr. Freeman.  Because he is retained, I cannot remove him
from the case.  That is entirely your
decision.  You have the choice to either
proceed forward with Mr. Gray, knowing what he intends to do in not offering a
defense, not questioning witnesses, etcetera. 
Or you can remove Mr. Gray and the Court will appoint you an
attorney.  It is your choice, but I will
tell you this.  If you choose to continue
with Mr. Gray, any ineffective assistance of counsel claim that may try to be
raised in all likelihood will no longer be valid because you will be choosing
to go forward knowing that that is what he=s
choosing to do.  Do you understand that?

 

[FREEMAN]: Yes, ma=am.

 

THE COURT: So it=s
your choice, Mr. Freeman.

 

[FREEMAN]: I=ll
continue.

 








Freeman argues that the trial court erred because it did not
advise him that, if new counsel was appointed, they would have ten days to
prepare for trial pursuant to Tex. Code
Crim. Proc. Ann. art. 1.051(e) (Vernon 2005) and that this effectively
denied him the statutorily required preparation period.  However, Article 1.051=s
application is not before us.  The
statute was never triggered because Freeman did not receive appointed
counsel.  Moreover, from this exchange,
we cannot say whether the court would have denied a request for additional time
if Freeman had accepted the trial court=s
offer or whether the court would have even continued with the trial.[9]  The issue before us is: Was the trial court
required to advise Freeman of the statute=s
preparation provision so that he could make an informed decision on whether to
discharge his retained counsel?

First, we are aware of no authority requiring the
trial court to even advise Freeman that he could dismiss his retained
counsel.  Second, the statute=s only expressly required admonishment
is  in Article 1.051(g).  This requires the court to advise a defendant
wishing to waive the right to appointed counsel of the dangers and
disadvantages of self-representation. 
Neither this provision, nor any case construing it, indicates that the
trial court is also required to advise the defendant that, if he is appointed
counsel, his counsel will have at least ten days to prepare for trial.  Applying this by analogy, the trial court
confirmed that Freeman understood the risks of proceeding with his retained
counsel.  We cannot conclude that more
was required.  Freeman=s fifth issue is overruled. 

E.  Did
the Trial Court Err by not Sua Sponte Granting a Mistrial?








Freeman argues that the trial court erred by not
sua sponte granting a mistrial when the State=s
counsel commented upon his exercise of the Sixth Amendment right to
counsel.  Specifically, Freeman complains
that, when the State asked Johnson who hired and paid for Freeman=s attorney and if this attorney had
been representing him since he was in jail, the State was attempting to prove
Freeman=s guilt
by pointing to the fact that he had sought the assistance of counsel.  Freeman acknowledges that he did not object
to these questions at trial but contends that this case is comparable to United
States v. McDonald, 620 F.2d 559, 564 (5th Cir. 1988), and that no
objection was required.  The State
responds that Freeman=s
failure to object waived any error.  See
Tex. R. App. P. 33.1(a).

The general rule is that a party must make a
timely and specific objection at trial to preserve an issue for appellate
review.  Ibarra v. State, 11
S.W.3d 189, 197 (Tex. Crim. App. 1999). 
This rule applies to all objections except complaints involving
violations of Arights
which are waivable only@
and denials of Aabsolute
systemic requirements.@  Aldrich v. State, 104 S.W.3d 890, 895
(Tex. Crim.
App. 2003).  Rights that are waivable
only include the right to assistance of counsel and the right to trial by
jury.  Absolute systemic requirements
include jurisdiction of the person, jurisdiction of the subject matter, and a
penal statute=s Acompliance with the Separation of Powers
Section of the state constitution.@  Saldano v. State, 70 S.W.3d 873, 888 (Tex. Crim. App. 2002).

In Saldano, the court held that the failure
to object to evidence that violated the defendant=s
rights under the Equal Protection Clause waived any error because this was
neither a waivable only right nor an absolute systemic requirement even though
the evidence concerned the defendant=s
constitutional rights.  Id. at 889.  We believe the same holds true here.  The State=s
examination of Johnson concerned Freeman=s
constitutional right to the assistance of counsel, but this was an evidentiary
issue that required an objection. 
Because Freeman did not object, issues sixteen and seventeen are
overruled.

F. 
Freeman=s
Requests for Lesser Included Offenses.

Freeman argues that the trial court erred by not
submitting the lesser included offenses of criminally negligent homicide and
aggravated assault in the charge.  The
trial court initially declined to include aggravated assault, but the court=s charge included instructions on the
lesser included offenses of aggravated assault and manslaughter.  Issue fourteen is, therefore, overruled.

The Texas Court of Criminal Appeals has adopted a
two-prong test to determine if the trial court is required to include an
instruction on a lesser included offense: 
(1) the lesser included offense must be included within the proof
necessary to establish the offense charged and (2) some evidence must exist in
the record that, if the defendant is guilty, he is guilty only of the lesser
offense.  Hampton
v. State, 109 S.W.3d 437, 440 (Tex.
Crim. App. 2003).  The State does not
dispute that criminally negligent homicide is a lesser included offense but
contends that there was no evidence that if Freeman was guilty it was only of
that offense.








The distinction between murder, manslaughter, and
criminally negligent homicide is the defendant=s
culpable mental state.  Murder, as
alleged in the indictment, required proof that Freeman knowingly or
intentionally caused Red=s
death or intended to cause serious bodily injury and committed an act clearly
dangerous to human life that caused Red=s
death.  See Tex. Pen. Code Ann. ' 19.02(b)(1) (Vernon 2003).  Manslaughter requires proof that the
defendant recognized the risk of death but consciously disregarded it.  For criminally negligent homicide, the defendant
is not, but ought to be, aware of the risk that death will result from his
conduct.   Masterson v. State, 155
S.W.3d 167, 171 (Tex.
Crim. App. 2005).

Freeman testified that, when he heard his car
alarm, he grabbed his revolver and went outside.  Freeman knew the gun was loaded.  When Red took off, Freeman pointed the  gun at him and fired two or three times.  Freeman testified that he did so to scare Red
and make him stop running.  Freeman
denied any intention to kill or injure Red and admitted that he did not know
where the bullets would go.

This testimony does not justify the submission of
a lesser included instruction on criminally negligent homicide.  The Texas Court of Criminal Appeals has held
that a defendant was presumed to know the risks of injury or death by
exhibiting a loaded, cocked pistol.  See
Salinas v.
State, 644 S.W.2d 744, 746 (Tex. Crim. App. 1983).  In Thomas v. State, 699 S.W.2d 845,
849-52 (Tex. Crim. App. 1985), the court recognized that, in most instances
involving a firearm, the evidence will not justify a criminally negligent
homicide instruction because the defendant will ordinarily have some
appreciation of the risks.  Here, there
was no evidence that Freeman did not appreciate the risks inherent with a
firearm, that he did not know his revolver was loaded, or that it accidently
discharged.  In fact, the evidence shows
that he intentionally fired a loaded weapon.








Moreover, even if he was entitled to an
instruction, the record shows no harm. 
The harm from denying a lesser offense instruction stems from the
potential to place the jury in the dilemma of convicting for a greater offense
in which the jury has a reasonable doubt or releasing entirely from criminal
liability a person the jury is convinced is a wrongdoer.  Masterson, 155 S.W.3d at 171.  The manslaughter instruction provided the
jury with a compromise.  Freeman=s testimony, if believed, squarely
presented the jury with a situation of reckless conduct.  Their decision to reject that option and find
him guilty of murder indicates that the jury legitimately believed he was
guilty of the greater, charged offense. 
Issue thirteen is overruled. 

G.  Is the Jury=s Rejection of Freeman=s Defenses Supported by Factually
Sufficient Evidence?

 

1.  Defense of Property.

 

Freeman contends that he was justified in using
deadly force to defend his property and that the jury=s
implied rejection of this defense was based upon factually insufficient evidence.  When a defendant raises a factual sufficiency
challenge to the jury=s
implied adverse finding on a defensive theory, we perform a factual sufficiency
review of the jury=s
verdict.  See, e.g., Roy v. State,
161 S.W.3d 30, 34-35 (Tex. App.CHouston
[14th Dist.] 2004, no pet.).  This
requires that we begin with the assumption that the evidence supporting the
jury=s verdict
is legally sufficient.  Clewis v.
State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996).  We view all of the evidence in a neutral
light, without favoring either party.  Johnson
v. State, 23 S.W.3d 1, 6-7 (Tex.
Crim. App. 2000).  We will set aside the
verdict only if the evidence supporting the verdict is so weak that the verdict
is clearly wrong and manifestly unjust or if the verdict is against the great
weight and preponderance of the conflicting evidence.  Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006).

When reviewing the evidence, we must give
appropriate deference to the jury findings in order to prevent intruding on the
fact-finder=s role as
the sole judge of the weight and credibility of the evidence.  Johnson, 23 S.W.3d at 7.  Therefore, unless the record clearly reveals
a different result is appropriate, we Amust
defer to the jury=s
determination concerning what weight to give contradictory testimonial evidence
because resolution often turns on an evaluation of credibility and demeanor.@ 
Id.
at 8.  








A person in lawful possession of property is
justified in using force against another when and to the degree the actor
reasonably believes the force is immediately necessary to prevent or terminate
the other=s
unlawful interference with the property. 
Tex. Pen. Code Ann. ' 9.41(a) (Vernon 2003).   A person unlawfully dispossessed of property
by another is justified in using force against the other when and to the degree
the actor reasonably believes the force is immediately necessary to recover the
property if the actor uses the force immediately or in fresh pursuit after
dispossession and the actor reasonably believes the other had no claim of right
when he dispossessed the actor.  Section
9.41(b).

A person is justified in using deadly force
against another to protect property if (1) he could otherwise use force (2)
when and to the degree he reasonably believes deadly force is immediately
necessary to prevent the other who is fleeing immediately after committing
burglary, robbery, aggravated robbery, or theft during the nighttime from
escaping with the property and (3) he reasonably believes the property cannot
be recovered by any other means.  Tex. Pen. Code Ann. ' 9.42 (Vernon 2003).  A reasonable belief is a belief that would be
held by an ordinary and prudent person in the same circumstances as the
actor.  Tex.
Pen. Code Ann. '
1.07(a)(42) (Vernon
Supp. 2006).

The jury was provided two explanations for the
shooting.  Freeman contended that he
reacted to a car burglary in the middle of the night and that he shot at Red to
make him stop running and return whatever he had taken from Freeman=s car. 
Other witnesses testified that Freeman had threatened to hurt or kill
Red in retaliation for stealing crack cocaine from his apartment, that Freeman
had been looking for Red, and that on the night of the shooting he sent someone
to see if Red was at a particular house. 
It was the jury=s
responsibility to resolve this conflicting evidence.  Their verdict necessarily reflects a
credibility determination that we cannot second guess.  The evidence supporting a determination that
Red was shot in retaliation for the crack cocaine theft and not to recover
property taken from Freeman=s
car is neither so weak that the jury=s
verdict is clearly wrong and unjust nor is it against the overwhelming weight
of the evidence.  Issue twelve is
overruled.

2. 
Sudden Passion.








Freeman also argues that the jury=s rejection of his sudden passion
defense was based upon factually insufficient evidence.  Murder is ordinarily a first degree felony,
but if the defendant proves by a preponderance of the evidence that he caused
the death under the immediate influence of sudden passion arising from an
adequate cause, it becomes a second degree felony.  Tex.
Pen. Code Ann. '
19.02(d) (Vernon 2003).  During the
punishment phase of the trial, Freeman testified and told the jury that, when
he shot Red, he was angry because A[he]
was tired of getting ripped off.@  The trial court instructed the jury on sudden
passion and included a jury issue on sudden passion.  The jury found against Freeman on this issue.

Section 19.02 defines Aadequate
cause@ to mean
cause that would commonly produce a degree of anger, rage, resentment, or
terror in a person of ordinary temper, sufficient to render the mind incapable
of cool reflection.  Section
19.02(a)(1).  The statute defines Asudden passion@
to mean passion directly caused by and arising out of provocation by the
individual killed or another acting with the person killed which passion arises
at the time of the offense and is not solely the result of former
provocation.  Section 19.02(a)(2).  Ordinary anger is not adequate cause.  Ybarra v. State, 890 S.W.2d 98, 109
(Tex. App.CSan
Antonio 1994, pet. ref=d).  The defendant=s
action must be taken while in an excited and agitated state of mind arising out
of the victim=s direct
provocation.  Merchant v. State,
810 S.W.2d 305, 310 (Tex. App.CDallas
1991, pet. ref=d).

For the same reasons the jury was entitled to
reject Freeman=s defense
of property defense, it was entitled to reject his sudden passion defense.  The evidence was sufficient to allow the jury
to determine that the shooting was not in response to a break-in of Freeman=s car that night but in retaliation for
the prior theft of cocaine from Freeman=s
apartment.  Issue eighteen is overruled.

H. 
Cumulative Effect.

Freeman=s
final issue is that the cumulative effect of the trial court=s errors warrants a reversal of his
conviction.  We have considered, and
overruled, each of his issues. 
Cumulative consideration of the issues raised by Freeman does not alter
our analysis.  Issue nineteen is
overruled.

                                 V. Holding

The judgment of the trial court is affirmed.

 

 

RICK STRANGE

JUSTICE

May 24, 2007

Publish.  See Tex. R. App. P. 47.2(b).

Panel
consists of:  Wright, C.J.,

McCall,
J., and Strange, J.











[1]The State does not concede the accuracy of Freeman=s statement, contending that, as of the 2000 census,
African-Americans comprised 20.31% of Dallas County=s population.  See
http://en.wikipedia.org/wiki/Dallas_County,_Texas#Demographics.  It is unnecessary for us to resolve this
issue.





[2]Even if the issue were before us, the record does not
indicate that the trial court abused its discretion.  The trial court noted that counsel had
interviewed Brewer before trial and that she had been accessible to him for
some time.  The court indicated that
counsel had been afforded the opportunity to learn about Miquel and that his
name should not have come as a surprise. 
We cannot say based upon the record that these conclusions constitute an
abuse of discretion.





[3]Brady v. Maryland, 373 U.S.
83 (1963).





[4]This was developed during the hearing on Freeman=s motion for continuance.





[5]Pursuant to Tex.
R. Evid. 615, the State was not required to provide Freeman with Brewer=s statement until after her testimony on direct.





[6]Freeman did not submit any written discovery requests,
but he did receive seventy-two pages of material from the district attorney=s office pursuant to its open file policy.





[7]Freeman was allowed to testify that Red was a crack
addict and was unemployed but that he always seemed to have money.  Freeman also testified that Red had tried to
sell him car stereos that he believed were stolen.  Consequently, the exclusion of additional
evidence of Red=s criminal history and reputation would be harmless in
any event.





[8]We note that Freeman is represented by different
counsel on appeal and that appellate counsel=s
representation before this court has at all times been professional and
conscientious.  





[9]In our discussion of this issue, we need not decide if
the trial court would have been required to provide appointed counsel ten days
to prepare for trial.  The ten-day
preparation period is not mandatory each time counsel is appointed.  For example, Article 1.051(h) provides that,
if a defendant waives his right to counsel but subsequently withdraws that
waiver, the trial court has the discretion to provide appointed counsel ten
days to prepare.